UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Ironshore Indemnity Inc., <br><br> Plaintiff <br><br> v. <br><br> Eric Kay, <br><br> Defendant | Case No.: 2:21-cv-01706-JAD-BNW <br><br> **Order Granting Motion for Judgment on the Pleadings in Favor of Plaintiff Ironshore Indemnity Inc.** <br><br> [ECF Nos. 54, 91] |

Ironshore Indemnity Inc. seeks a declaratory judgment that it has no duty to defend or indemnify Eric Kay—the former Chief Legal Officer of the now-bankrupt cyber-security company Cyber Litigation Inc.—for insurance claims arising from wrongful acts allegedly committed by Cyber Litigation's former Chief Executive Officer Adam Rogas. To obtain excess insurance coverage from Ironshore, Rogas signed a warranty letter affirming that he and "all insureds" had no knowledge or information of acts that could give rise to a claim under the policy and dictating that any claims arising from such knowledge would be excluded from coverage. Later, the U.S. Securities and Exchange Commission and the Department of Justice filed civil and criminal suits against Rogas, alleging that he committed securities fraud while he was CEO.

In 2021, Cyber Litigation sent a demand letter to Kay, claiming that he breached his fiduciary duties to the company because he was on notice of Rogas's fraud and did not report it to the company's board. Kay tendered that claim to Ironshore for coverage under the excess policy, prompting this coverage suit. The parties cross-move for judgment on the pleadings, with Ironshore seeking a declaratory judgment that Kay's insurance claim is excluded from coverage because it arises from Rogas's prior knowledge of his own fraudulent conduct and Kay

arguing that Cyber Litigation's demand letter against him does not fall within the exclusion. Because Ironshore has shown that the warranty letter's exclusion applies, I grant its motion and deny Kay's.

## Background[1]

This insurance dispute arises from the downfall of NS8, a cyber-security company that was based in Las Vegas, and the alleged wrongdoing of its co-founder and former CEO, Adam Rogas. In March 2019, NS8 and Rogas obtained a $2 million directors-and-officers (D&O) insurance policy from Scottsdale Insurance Company.[2] Two months later, NS8 and Rogas obtained an excess policy from Ironshore for $5 million.[3] To obtain that excess coverage, Rogas signed a warranty letter on behalf of himself and "all insureds" representing that "no insured has knowledge or information of any act, error[,] or omission [that] might give rise to a claim(s), suit(s)[,] or action(s) under either the first $2,000,000 limit of liability or Excess Limits . . . ."[4] The warranty letter also stated that, "if such claim(s), suit(s), action(s), knowledge[,] or information exists, then such claim(s), suit(s)[,] or action(s) and any claim(s), suit(s)[,] or action(s) arising therefrom or arising from such knowledge or information is excluded from coverage under the Excess Limits."[5]

In November 2019, the U.S. Securities and Exchange Commission began investigating NS8 and Rogas for securities fraud.[6] The following year, the SEC and the U.S. Department of

---

[1] These facts are taken from Ironshore's complaint and exhibits attached to the complaint and should not be construed as findings of fact.

[2] ECF No. 3 at ¶ 2 (Ironshore's complaint); *see also* ECF No. 3-2 (Scottsdale insurance policy).

[3] ECF No. 3 at ¶ 2; *see also* ECF No. 3-3 (Ironshore excess policy).

[4] ECF No. 3 at ¶ 2; *see also* ECF No. 3-4 (Ironshore warranty letter).

[5] *Id.*

[6] ECF No. 3 at ¶ 3.

Justice, respectively, filed a civil and a criminal suit against Rogas alleging that he "defrauded investors by using forged documents to entice investors to purchase NS8 securities" and "pocketed over $17.5 million that ha[d] been raised through his fraud."[7] Among the allegations in the SEC lawsuit are that Rogas began defrauding investors as early as 2018—before he signed the Ironshore warranty letter.[8]

In October 2020, NS8 filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Delaware.[9] As part of that bankruptcy action, NS8 sold many of its assets, including the rights to the name NS8, and changed its name to Cyber Litigation.[10] In July 2021, attorneys for Cyber Litigation sent a demand letter to Eric Kay, co-founder and former director and Chief Legal Officer of NS8, claiming that Kay breached his fiduciary duties to NS8 because he "gained intimate knowledge of material irregularities and alarming discrepancies regarding NS8's reported revenue and customer counts, financial controls, and corporate governance practices" and failed to report those issues to NS8's board.[11] In the demand letter, the Cyber Litigation attorneys allege that Kay "repeatedly learned of the aforementioned irregularities and discrepancies through internal NS8 communications that put him on notice of the fraud being perpetrated by NS8's former CEO, Adam Rogas."[12]

---

[7] *Id.*

[8] *Id.* at ¶ 4.

[9] *See In re Cyber Litigation Inc.*, Case No. 20-12702-CTG; *see also* ECF No. 3-8 at 4 (Kay demand letter).

[10] ECF No. 5 at 4 n.1.

[11] ECF No. 3-8 at 5.

[12] *Id.*

Kay then notified Ironshore of the Cyber Litigation demand letter and requested coverage under the excess policy.[13] Ironshore disputes its coverage obligation and filed this action in September 2021, seeking a declaratory judgment absolving it of the duties to defend or indemnify Rogas, Kay, and "all [i]nsureds" for the government actions against Rogas and the demand letter against Kay.[14] In December, Ironshore voluntarily dismissed its claims against Rogas and filed a motion for judgment on the pleadings as to its claims against Kay.[15] Ironshore contends that it has no duty to defend or indemnify Kay for the Cyber Litigation demand letter because the allegations in it arose from wrongful acts that Rogas committed—and thus had knowledge of—before he signed the Ironshore warranty letter.[16] Kay also moves for judgment on the pleadings, arguing that the warranty exclusion does not apply to his insurance claim primarily because Ironshore has not proven that Rogas had "actual knowledge" of his wrongdoing prior to signing the warranty letter and because non-imputation provisions in the underlying policy prevent Ironshore from imputing any such knowledge to Kay.[17]

In March 2022, after most of the briefing on these competing motions was completed, Rogas pled guilty to one count of securities fraud in the DOJ case against him.[18] I permitted the

---

[13] *Id.* at 2.

[14] ECF No. 3 at 11–13.

[15] ECF No. 53 (notice of voluntary dismissal); ECF No. 54 (motion for judgment on the pleadings).

[16] ECF No. 54.

[17] ECF No. 91.

[18] *See U.S. v. Rogas*, Case No. 20-cr-00539-JPC; ECF No. 96-3 (DOJ case docket); ECF No. 100-2 (DOJ press release). Also in March 2022, the court overseeing Cyber Litigation's bankruptcy action issued a confirmation order approving the appointment of a plan trustee and assigned all causes of action to the trustee, including the claims against Kay in the demand letter. *See* ECF No. 96 at 2. But because this development doesn't factor into my decision, I don't address it here.

4

parties to file supplemental briefs to address the impact of that guilty plea on their argument.[19]
In its supplement, Ironshore argues that Rogas's guilty plea "undoubtedly" triggers the warranty exclusion.[20] Kay responds that the guilty plea doesn't clearly demonstrate that Rogas admitted to having knowledge of wrongful acts prior to signing the Ironshore warranty letter in May 2019 and thus doesn't impact whether the warranty exclusion applies.[21]

## Discussion

## I. Legal standards

### A. Judgment on the pleadings

Federal Rule of Civil Procedure 12(c) permits any party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial . . . ."[22] The moving party bears the burden of establishing that, "on the face of the pleadings[,]" no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law."[23] A Rule 12(c) motion is the functional equivalent of a Rule 12(b)(6) motion.[24] So the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."[25] "[W]hen both parties move for a judgment on

---

[19] ECF No. 102.

[20] ECF No. 103. Ironshore also argues that Rogas's guilty plea triggers other exclusions in the policy that kick in upon entry of final judgment against an insured. *See id.* I need not and do not reach those arguments because I find that the warranty exclusion bars coverage without reaching the impact of Rogas's guilty plea.

[21] ECF No. 104. Oral argument on these motions was held on September 8, 2020. ECF No. 108.

[22] Fed. R. Civ. P. 12(c).

[23] *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

[24] *See Harris v. Orange Cty.*, 682 F.3d 1126, 1131 (9th Cir. 2012).

[25] *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). Both parties request that I take judicial notice of various documents in the actions against Rogas and Cyber Litigation's bankruptcy action. *See* ECF No. 55 (Ironshore's request for judicial notice of an email sent by Rogas, originally filed in the SEC action against him); ECF No. 93 (Ironshore's request for

the pleadings, they are admitting all of the allegations in their adversary's pleadings only for purposes of their own motion and not for the consideration of their opponent's motion."[26]

### B. Insurance contracts and the duty to defend

In Nevada,[27] insurance policies are treated like other contracts, so legal principles that apply to contracts generally apply to insurance policies.[28] "When reading a provision of an insurance policy, the court's interpretation 'must include reference to the entire policy, which

---

judicial notice of the SEC complaint, the DOJ's criminal complaint, and the DOJ's criminal indictment against Rogas); ECF No. 97 (Kay's request for judicial notice of various filings in Cyber Litigation's bankruptcy action); ECF No. 100 (Ironshore's request for judicial notice of the DOJ's press release announcing Rogas's guilty plea). Because I rely only on the SEC complaint in my analysis, I grant Ironshore's request for that document and deny the remaining requests. *See United States v. Raygoza-Garcia*, 902 F.3d 994, 1001 (9th Cir. 2018) (noting that "[a] court may take judicial notice of undisputed matters of public record, which may include court records available through PACER"). And I take notice only of the fact that such allegations were made against Rogas, not of their truth. *See In re Herb Goetz & Marlen Horn Assoc., Inc.*, 120 F.3d 268, at *2 (9th Cir. 1997) (unpublished) ("Although a court may take judicial notice of its own records, it cannot take judicial notice of the truth of the contents of all documents found therein.").

[26] 5C Wright & Miller § 1370 (3d ed.).

[27] The insurance policies do not contain a choice-of-law provision. Ironshore contends that Nevada law applies to this dispute; Kay insists that Delaware law applies. I look to Nevada law—as the law of the forum state—to make choice-of-law determinations. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005). "Nevada tends to follow the Restatement (Second) Conflicts of Law (1971) in determining choice-of-law questions involving contracts . . . and insurance contracts, in particular." *Progressive Gulf Ins. Co. v. Faehnrich*, 327 P.3d 1061, 1063 (Nev. 2014) (internal citations omitted). Under § 193 of the Restatement, the rights created by insurance contracts like the one at issue here "are determined by the local law of the state [that] the parties understood was to be the principal location of the insured risk during the term of the policy." Restatement (Second) of Conflict of Laws § 193 (1971). Ironshore's excess policy was extended to NS8, a Nevada company, and the warranty letter was signed by Rogas in Nevada. I find that Nevada was the principal location of the insured risk, so Nevada law applies to this dispute. Regardless, Kay notes in his briefs and represented at the hearing that applying Delaware law would not bring about a different result because the applicable law is similar in both states.

[28] *Century Sur. Co. v. Andrew*, 432 P.3d 180, 183 (Nev. 2018) (citations omitted).

will be read as a whole [] to give reasonable and harmonious meaning to the entire policy.'"[29] "If a provision in an insurance contract is unambiguous, a court will interpret and enforce it according to the plain and ordinary meaning of its terms."[30] "Whether an insurance policy is ambiguous turns on whether it creates reasonable expectations of coverage as drafted."[31]

"Under an insurance policy, the insurer owes two contractual duties to the insured: the duty to defend and the duty to indemnify."[32] The duty to defend is "separate from . . . and broader than the duty to indemnify."[33] "Under Nevada law, '[d]etermining whether an insurer owes a duty to defend is achieved by comparing the allegations of the [underlying] complaint with the terms of the policy.'"[34] "If there is any doubt about whether the duty to defend arises, this doubt must be resolved in favor of the insured."[35] "An insurer bears a duty to defend its insured whenever it ascertains facts [that] give rise to the potential of liability under the policy."[36]

### III. Ironshore is entitled to judgment on the pleadings.

Ironshore argues that it is entitled to judgment on the pleadings because the warranty letter that Rogas signed excludes coverage for any claim arising out of Rogas's pre-signing knowledge of acts that might give rise to a claim. To establish that knowledge, Ironshore points

---

[29] *Zurich Am. Ins. Co. v. Ironshore Specialty Ins. Co.*, 497 P.3d 625, 628 (Nev. 2021) (quoting *Siggelkow v. Phoenix Ins. Co.*, 846 P.2d 303, 304 (Nev. 1993)).

[30] *Fed. Ins. Co. v. Coast Converters*, 339 P.3d 1281 (Nev. 2014) (quoting *Powell v. Liberty Mut. Fire Ins. Co.*, 252 P.3d 668, 672 (Nev. 2011)).

[31] *Id.*

[32] *Id.* (citing *Andrew*, 432 P.3d at 183).

[33] *Andrew*, 432 P.3d at 183.

[34] *Christensen v. Darwin Nat. Assur. Co.*, 645 F. App'x 533, 534 (9th Cir. Mar. 23, 2016) (quoting *United Nat'l Ins. v. Frontier Ins.*, 99 P.3d 1153, 1158 (2004) (en banc)).

[35] *United Nat'l Ins.*, 99 P.3d at 1158.

[36] *Andrew*, 432 P.3d at 183.

to the civil complaint against Rogas, in which the SEC alleges that Rogas falsified account-revenue statements from January 2018 through June 2020.[37] Kay contends that the Cyber Litigation demand letter's allegations against him are separate and distinct from Rogas's conduct, that mere allegations of prior knowledge are insufficient to trigger the exclusion, and that non-imputation provisions in the underlying Scottsdale policy prevent Ironshore from imputing Rogas's knowledge to Kay.[38]

### A. Kay's claim arises from Rogas's fraudulent conduct.

The warranty letter excludes coverage for "any claim, suit, or action . . . arising from" "knowledge or information of any act, error, or omission [that] might give rise to a claim, suit, or action" under the policy.[39] Courts give a broad interpretation to the term "arising from" in contracts. The Ninth Circuit, for example, has consistently interpreted "arising from" to encompass "originating from, having its origin in, growing out of, flowing from, incident to, or having connection with."[40] Courts have held that prior-knowledge exclusions with "arising from" language apply to "all proceedings sharing common facts and circumstances," even if

---

[37] ECF No. 3-5 at 8.

[38] The parties do not dispute that the Kay demand letter constitutes a "claim" under the policy's definitions or that the policy would normally apply if not for the application of various exclusions.

[39] ECF No. 3-4 at 2–3 (cleaned up).

[40] *Los Angeles Lakers v. Fed. Ins. Co.*, 869 F.3d 795, 801 (9th Cir. 2017) (quoting *Crown Cap. Sec. L.P. v. Cordova Airlines, Inc.*, 186 Cal. Rptr. 3d 1, 7 (2015)); *see also Cont'l Cas. Co. v. Richmond*, 763 F.3d 1076 (9th Cir. 1985) (noting that California courts interpret "'arising out of' . . . more broadly than 'caused by' to include the notion of 'incident to or having connection with'") (citation omitted). Nevada courts have not interpreted similar policy language, so I must "make a reasonable determination of the result the highest state court would reach if it were deciding the case" using "intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002); *Strother v. S. Cal. Permanent Medical Group*, 79 F.3d 859, 865 (9th Cir. 1996). I find that the Nevada Supreme Court would similarly interpret this policy language.

8

those proceedings "involve[] different parties, legal theories, wrongful acts, and requests for relief."[41]

The Kay demand letter focuses on Kay's alleged breach of fiduciary duties caused by his failure to report Rogas's fraudulent conduct. It relies entirely on Kay's failure to do something about the "fraud being perpetrated by" Rogas after he was repeatedly put on notice of that fraud. I find that the warranty's language unambiguously encompasses Kay's claim. His alleged breaches of fiduciary duty flow from Rogas's fraud: but for Rogas's fraudulent conduct, Kay could not have breached any duty by failing to report financial irregularities caused by Rogas's actions. Kay repeatedly states, without analysis or authority, that the allegations in the demand letter are "separate and distinct" from the SEC allegations of Rogas's fraud. That may be true, but they nonetheless *arise from* Rogas's actions. So if Ironshore can show that Rogas's alleged prior knowledge triggers the warranty exclusion, Kay's claim is excluded from coverage.

### B. The SEC allegations against Rogas trigger the warranty's exclusion.

Kay argues that Ironshore has not met its burden to show that the exclusion applies because the SEC allegations against Rogas do not prove that Rogas had "actual knowledge or information" about his fraudulent conduct before May 2019.[42] Ironshore responds that the provision does not require "actual" knowledge, and it points to *Rivelli v. Twin City Fire*

---

[41] *Alterra Excess & Surplus Ins. Co. v. Gotama Bldg. Eng'rs, Inc.*, 2014 WL 3866093, at *6 (C.D. Cal. July 24, 2014); *see also, e.g.*, *WFS Fin., Inc. v. Progressive Cas. Ins. Co., Inc.*, 232 F. App'x 624, at *1 (9th Cir. Apr. 16, 2007) (unpublished) (noting that two lawsuits arose from the same wrongful acts and that "although the suits were filed by two different sets of plaintiffs in two different fora under two different legal theories, the common basis for those suits" was the same wrongful act and thus could be treated as "a single claim under the policy"); *XL Specialty Ins. Co. v. Perry*, 2012 WL 3095331, at *6 (C.D. Cal. July 27, 2012) (noting that "arising out of" "does not require any particular theory of causation and connotes only a 'minimal casual connection or incidental relationship'" and treating underlying actions are interrelated "if they have in common any of the same underlying facts, circumstances, [or] events").

[42] ECF No. 73 at 9.

9

*Insurance Company*,[43] an unpublished Tenth Circuit opinion, for the proposition that the SEC allegations are sufficient. The facts in *Rivelli* are very similar to those presented in this case. In *Rivelli*, the insureds obtained stacking D&O policies from various insurance companies—one of which was an excess policy that was secured by signing a warranty letter representing that no insured had any knowledge of any act or omission that could give rise to a claim under the policy.[44] Later, the SEC filed a civil complaint against the insureds, alleging that they committed securities fraud in the years before the warranty letter was signed, and the insureds sued the insurance company to enforce its duty to defend.[45] The insurance company moved for summary judgment, arguing that the exclusion in the warranty letter barred coverage for the SEC action. The district court granted that motion, finding that the allegations in the SEC complaint showed that the insureds "knew of wrongful activities that could give rise to a claim" under the policy before they signed the warranty letter.[46] On appeal, the Tenth Circuit affirmed and determined that the SEC's allegations fell squarely within the exclusion in the warranty letter, noting that "under the exclusionary language, it does not matter what the insureds believed, only what the SEC's amended complaint alleged [that] they knew."[47]

I find *Rivelli*'s reasoning persuasive and thus consider the SEC complaint's allegations against Rogas to determine whether Kay's insurance claim falls within the warranty letter's exclusion. Kay has not offered any authority to support the contrary position, and his attempts to distinguish *Rivelli* are unpersuasive. Kay argues that *Rivelli* relied on inapplicable Colorado law,

---

[43] *Rivelli v. Twin City Fire Ins. Co.*, 359 F. App'x 1 (10th Cir. 2009) (unpublished).
[44] *Id.* at *3.
[45] *Id.*
[46] *Id.* (citing *Rivelli v. Twin City Fire Ins. Co.*, 2008 WL 5054568, at *6–8 (D. Colo. Nov. 21, 2008) (unpublished)).
[47] *Id.* at *7.

but he fails to point to any meaningful distinctions that would suggest that the Nevada Supreme Court would diverge from *Rivelli*'s reasoning and I can find none.[48] Kay also notes that *Rivelli* was decided at the summary-judgment stage and thus the court may have considered other evidence to reach its conclusion,[49] but the *Rivelli* court explicitly stated that its decision was based solely on the allegations in the SEC's complaint.[50] Kay adds that, because the allegations in Cyber Litigation's demand letter are "separate and distinct" from the SEC's allegations against Rogas, *Rivelli* is inapplicable.[51] As discussed supra, however, because Kay's insurance claim arises from Rogas's conduct, I must evaluate the relevant allegations against Rogas to determine the scope of the exclusion.

Kay's insistence that Ironshore must prove "actual" knowledge or information to trigger the exclusion is also unpersuasive. Kay's position inexplicably adds language to the warranty letter that simply does not exist. The letter's exclusion does not require "actual" knowledge or any final determination before it can be triggered. And if the policy exclusion were intended to apply only after a claim had reached some final determination, the policy would expressly say so.[52] For example, the criminal-acts exclusion in the underlying Scottsdale policy expressly

---

[48] ECF No. 73 at 14.

[49] *Id.*

[50] *See Rivelli*, 359 F. App'x at *5.

[51] ECF No. 73 at 14–15.

[52] *See, e.g.*, *Paloma Res. LLC v. Axis Ins. Co.*, 452 F. Supp. 3d 579, 587–588 (S.D. Tex. 2020) (finding that "when a policy exclusion was intended to apply in the event of an actual determination of a claim, the policy explicitly states so in no uncertain terms" and holding that, "where one exclusion in [the policy] contains an express limitation on coverage, it would be unreasonable for the [c]ourt to read that limitation into a completely differently worded exclusion").

states that the exclusion does not apply "unless and until there is a final judgment . . . as to such conduct."[53] There is no such language in the warranty letter's exclusion.

So I turn to the SEC's allegations against Rogas. The civil complaint alleges that, as early as 2018, Rogas falsified bank statements for public offerings and thus committed securities fraud.[54] That allegation unequivocally demonstrates Rogas's knowledge of "an[] act, error[,] or omission [that] might give rise to a claim" under Ironshore's warranty exclusion language. And as discussed supra, because Kay's claim arises out of Rogas's knowledge, I find that the warranty exclusion applies to Kay's demand-letter claim.[55]

### C. The Scottsdale policy's non-imputation provisions don't apply to the warranty exclusion.

Kay contends that, even if the court can rely on the SEC's allegations of Rogas's knowledge, non-imputation provisions in the underlying Scottsdale policy prevent this court from "imputing" Rogas's knowledge to Kay in order to bar coverage.[56] Kay points to two potentially applicable provisions. The first is found at the end of the "exclusions" section of the Scottsdale policy and states that "[n]o wrongful act of one or more insureds shall be imputed to any other insureds for the purpose of determining the applicability of any of the above

---

[53] ECF No. 3-2 at 13.

[54] See ECF No. 3-5 at 2. At the judgment-on-the-pleadings stage, the court can consider exhibits attached to the complaint and documents properly subject to judicial notice. The SEC complaint qualifies as both. And I also may consider facts outside the Kay demand letter to determine Ironshore's duty to defend in this declaratory-judgment action. *See Andrew*, 432 P.3d at 184 n.4.

[55] I do not consider whether Rogas's guilty plea in the DOJ action against him proves prior knowledge because the SEC allegations against him are sufficient. And I do not reach the myriad other exclusions that Ironshore contends apply because Ironshore has shown it does not have a duty to defend or indemnify Kay under the warranty exclusion.

[56] *See* ECF No. 73 at 11; ECF No. 96 at 6–8.

exclusions."[57] Kay contends that this provision applies because the warranty letter "purports to be an exclusion" and thus is implicitly incorporated into the exclusions section of the Scottsdale policy.[58] But the non-imputation clause expressly limits its application to the "above" exclusions, and the warranty letter's exclusion was never incorporated into that "above" exclusions section. The parties had the ability to add exclusions to that section and did so numerous times for other exclusions, but did not do so for the warranty-letter exclusion.[59] So by the express terms of the policy, the non-imputation provision does not apply to the warranty exclusion.

The second non-imputation provision is found in "endorsement no. 9" of the Scottsdale policy's "warranty" section. This endorsement excludes from coverage any claim resulting from a misrepresentation contained in the "applications" submitted by the insureds in order to obtain coverage.[60] The policy defines "application" as "all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the insureds to the insurer in connection with the insurer underwriting this policy or any policy of which this policy

---

[57] ECF No. 3-2 at 15 (cleaned up).

[58] ECF No. 96 at 7.

[59] Indeed, the parties added new exclusions to the underlying policy on at least two occasions through "endorsements" to the policy. *See* ECF No. 3-2 at 35–36. Those endorsements explicitly stated that the exclusion "is added to Section C. EXCLUSIONS." *Id.*

[60] ECF No. 3-2 at 6–7 ("warranty" provision in underlying Scottsdale policy); *id.* at 26 (endorsement no. 9). Kay first raises this non-imputation argument in his reply brief in support of his judgment-on-the-pleadings motion. ECF No. 96 at 7 n.3. Issues raised for the first time in a reply brief are typically waived. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999). But I consider it because I must consider a contract's language as a whole when interpreting insurance policies. *See Zurich* 497 P.3d at 628. Ignoring this provision because of Kay's failure to raise it earlier would prevent me from determining whether the contract—as a whole—excludes coverage for Kay's claim. Plus, the parties have had the opportunity for supplemental briefing and oral argument on these competing motions.

is a renewal or replacement."[61] And the non-imputation clause in endorsement no. 9 states that, "with respect to any statement, representation[,] or information contained in the application . . . and solely with respect to the above exclusion, no knowledge possessed by any insured who is a natural person shall be imputed to any other insured who is a natural person."[62]

Even assuming that the warranty letter qualifies as an "application" under the Scottsdale policy and thus that the non-imputation provision in endorsement no. 9 applies, Kay's imputation argument still fails. Ironshore's warranty exclusion does not require that Rogas's "knowledge" be imputed to Kay for the exclusion to apply to him. The warranty was issued on behalf of *all* insureds and represented that *no* insured had any knowledge of any act that may give rise to a claim. And if that representation was false and such knowledge of any insured did exist, the warranty unambiguously excludes from coverage "*any claim*" arising from that knowledge. Because Kay's claim arises from Rogas's knowledge, I need not "impute" Rogas's knowledge onto Kay for the broad language of the warranty exclusion to apply to his claim. So I find that the non-imputation provisions in the underlying Scottsdale policy do not prevent the warranty exclusion from applying to Kay's claim.[63]

---

[61] ECF No. 3-2 at 5 (cleaned up).

[62] *Id.* at 26.

[63] The majority approach to broad prior-knowledge exclusions like this one supports this finding. *See, e.g.*, *Minn. Lawyers Mut. Ins. Co. v. Hancock*, 600 F. Supp. 2d 702, 707 (E.D. Va. 2009) (excluding coverage for "innocent" insureds based on representations made on behalf of "all insureds"); *Coregis Ins. Co. v. Lyford*, 21 F. Supp. 2d 695, 699 (S.D. Tex. 1998) (noting that a similar prior-knowledge exclusion "does not concern itself with imputed knowledge [because] knowledge of an impending claim on the part of 'any' insured is what triggers the policy exclusion with respect to all insureds"). And the Nevada Supreme Court has held that other types of exclusions based on the actions of any insured unambiguously excluded coverage for all insureds on the policy. *See Fire Ins. Exch. v. Cornell*, 90 P.3d 978, 980 (Nev. 2004). I conclude that the Nevada Supreme Court would hold similarly here.

### D. The warranty exclusion is unambiguous.

Kay also argues that the warranty exclusion cannot be applied because it is ambiguous as it conflicts with other exclusions in the underlying policy.[64] But "exclusions in insurance agreements need to be read independently of one another so that no two exclusions would ever be inconsistent,"[65] and courts consistently hold that "overlapping" exclusions do not cause ambiguity in insurance contracts.[66] Plus, Ironshore's excess policy expressly states that it will provide coverage "in accordance with the terms, definitions, conditions, exclusions, and limitations of the [Scottsdale] policy, except as may be otherwise provided in this policy."[67] So, to the extent Ironshore's warranty exclusion conflicts with other knowledge exclusions in the underlying policy, Ironshore's exclusion controls.[68]

---

[64] ECF No. 73 at 17–18.

[65] *Nelson v. XL America, Inc.*, 2017 WL 4185461, at *3 (D. Nev. Sept. 21, 2017). In *Nelson*, I was persuaded by the rationale, followed by at least ten other jurisdictions, that exclusions must be read independently of every other exclusion to give each exclusion its intended effect. *Id.* (citing *Fidelity Nat'l Ins. Co. of New York v. OHIC Ins. Co.*, 619 S.E.2d 704, 708 (Ga. Ct. App. 2005) (citing to cases from New Jersey, Michigan, New York, Oklahoma, Pennsylvania, Puerto Rice, Tennessee, Wisconsin, Illinois, and Washington to support this holding)). I remain persuaded by this reasoning, and Kay does not provide any argument or authority to counsel me otherwise.

[66] *See, e.g.*, *BancInsure, Inc. v. FDIC*, 796 F.3d 1226, 1239 (10th Cir. 2015) (noting that "the mere fact of an overlap between [] two exclusions does not introduce ambiguity into the plain language" of an applicable exclusion); *Certain Interested Underwriters at Lloyd's, London v. Stolberg*, 680 F.3d 61, 68 (1st Cir. 2012) (noting that "some overlap is to be expected" in insurance-policy exclusions and that any such overlap doesn't render the exclusions ambiguous); *In re SRC Holding Corp.*, 545 F.3d 661, 670 (8th Cir. 2008) (noting that "nothing prevents the parties" from drafting redundant exclusions "in order to be 'doubly sure'").

[67] ECF No. 3-3 at 5.

[68] *See, e.g.*, *Home Ins. Co. v. Am. Home Prod. Corp.*, 902 F.2d 1111, 1113 (2d Cir. 1990) (holding that, when a secondary policy applies the underlying policy's terms "except as otherwise provided herein," the secondary policy controls "if there is any conflict between the two insuring agreements").

### E. Kay is not entitled to judgment on the pleadings in his favor.

Because Kay's motion for judgment on the pleadings is predicated on the same arguments against the warranty exclusion that he raised in his response to Ironshore's motion and I have found that Ironshore is entitled to that relief, I deny Kay's motion as moot.[69] But even if I has addressed Kay's motion on the merits, I would deny it. A defendant cannot "succeed on a motion under Rule 12(c) if there are allegations in the plaintiff's pleadings that, if proved, would permit recovery on his claim."[70] Kay did not meet his burden to show that, if Ironshore's allegations are taken as true and Rogas had prior knowledge that would trigger the warranty exclusion, Ironshore would not be entitled to any relief.

### Conclusion

IT IS THEREFORE ORDERED that Ironshore Indemnity Inc.'s motion for judgment on the pleadings **[ECF No. 54] is GRANTED.** The Court hereby **DECLARES that Ironshore has no duty to defend Kay, nor to pay any costs, charges, or expenses on behalf of Kay, under the Ironshore excess policy for Cyber Litigation's demand letter against Kay. Ironshore has no duty to indemnify Kay for any loss under the Ironshore excess policy for the Kay demand letter**. The Clerk of Court is directed to **ENTER JUDGMENT ACCORDINGLY and CLOSE THIS CASE**.

IT IS FURTHER ORDERED that Eric Kay's motion for judgment on the pleadings **[ECF No. 91] is DENIED.**

_____
U.S. District Judge Jennifer A. Dorsey
September 16, 2022

---

[69] I also decline to address Kay's objections to evidence Ironshore submitted in its response to Kay's motion because I did not consider that evidence to make my determinations in this order.

[70] 5C Wright & Miller § 1368 (3d ed.).

16